SMITH *v.* FAUBUS, CHAIRMAN.

5-1810                                327 S. W. 2d 562

Opinion Delivered September 14, 1959.

[Rehearing denied October 19, 1959]

832

*James M. Nabrit,* Washington, D. C., *U. Simpson Tate,* Dallas, Texas, *Thad D. Williams, Harold B. Anderson* and *J. R. Booker,* for appellant.

*R. B. McCulloch, Richard McCulloch* and *J. L. Shaver,* for appellee.

ED. F. McFADDIN, Associate Justice. This appeal presents for decision the validity of Acts 83 and 85 of the 1957 Arkansas General Assembly. Appellants, Smith *et al.,* were plaintiffs below. They filed suit for declaratory judgment, *inter alia,* and claimed that both of the said Acts were void. Appellees, Faubus *et al.,* were defendants below, and constitute the membership of the State Sovereignty Commission created by the said Act No. 83. The Chancery Court held both Acts to be

valid and dismissed the complaint. This appeal resulted in which eleven points[1] are urged by appellants against the validity of one or the other of the Acts. For convenience we will consider separately the two legislative enactments.

## ACT NO. 83.

This Act is captioned: ''An Act Creating the State Sovereignty Commission; Defining Its Powers and Duties; and for Other Purposes.'' Sections 1 to 6 concern the creation of the Commission and the persons who are designated or permitted to be appointed as members of the Commission. Sections 7, 8, and 9 of the Act authorize the employment of personnel, payment of expenses, *etc.* Section 10 lists the powers and duties of the Commission; and portions of this section will be discussed in Topic III *infra.* Sections 11, 12, 13, 14, and 15 give powers of inspection and examination to the Commission and authorize hearings. Section 11 will be discussed in Topic II *infra.* Section 16 requires cooperation by other officers and employees of the State with the Commission; Section 17 is the separability clause; and Sec-

---

[1] These points, as contained in appellants' brief are:

"1.   The Acts constitute class legislation based on the classification of race and color.

"2.   They fix no limits upon the power and authority of the State Sovereignty Commission.

"3.   They are not justified by any proper or lawful governmental objective, nor to achieve same.

"4.   They deprive plaintiffs and other Negro citizens of Arkansas, similarly situated because of their race and color, of their right to Freedom of Speech and Assembly; and, their right of petition secured to them by Article 11, Section 4 of the Constitution of Arkansas and the 14th Amendment as transmitted from the 1st Amendment of the Constitution of the United States.

"5.   They compel a person to bear witness against himself.

"6.   They are *ex post facto* in their nature.

"7.   They interfere with plaintiffs and other Negro citizens of Arkansas, similarly situated, in their right to worship God under the dictates of their own conscience.

"8.   They permit the General Assembly of Arkansas to perform executive functions contrary to Article IV of the Constitution of Arkansas.

"9.   They violate Article V, Section 10 of the Constitution of Arkansas.

"10.   They authorize unlawful search and seizure contrary to Article II, Section 15 of the Constitution of Arkansas.

"11.   They are too vague and indefinite for enforcement, and the alleged 'emergency' for inclusion of the Emergency Clause, does not exist."

tion 18 is the emergency clause. Some of the eleven points relied on by plaintiffs do not apply to Act No. 83, so we list our own topic headings.

I. *The Attack on Sections 2 And 3 Of The Act No. 83.* In all there are twelve members of the Commission: the Governor, Attorney General, Lieutenant Governor, and Speaker of the House of Representatives, are *ex-officio* members; and the other eight members consist of three citizens appointed by the Governor from geographical areas, two State Senators appointed by the President of the Senate, and three Representatives appointed by the Speaker of the House. This point challenges the right of members of the General Assembly to be named to the State Sovereignty Commission. Article V, Section 10 of the Arkansas Constitution says: "No Senator or Representative shall, during the term for which he shall have been elected, be appointed or elected to any civil office under this State."

In *Fulkerson v. Refunding Board,* 201 Ark. 957, 147 S. W. 2d 980, we held that the members of the General Assembly could not serve as members of the Refunding Board created by the Act No. 4 of the 1941 Legislature; and we are unable to distinguish the holding in that case from the point here presented. The late and beloved Mr. Justice FRANK G. SMITH wrote the opinion in *Fulkerson v. Refunding Board*; and in his usual clear and fully explanatory manner he said:

"It is alleged that § 1 of Act No. 4 violates §§ 1 and 2, of Art. 4, and § 10 of Art. 5, and § 6 of Art. 18, of the Constitution, and is, therefore, invalid, because it provides that three senators and five representatives shall be members of the Refunding Board.

"We are of the opinion that this objection is well taken, and that these members of the General Assembly are not eligible to serve as members of the board, because of their membership in the General Assembly which enacted the legislation.

"It is thought to be contrary to both the spirit and the letter of the Constitution for the General Assembly

to create an office or board or other state agency, and then to fill the place thus created with one or more of its own members. The recent case of *Oates* v. *Rogers,* 201 Ark. 335, 144 S. W. 2d 457, announces the policy of the Constitution and laws of this State to separate and keep distinct the departments of government.

"Now, of course, the General Assembly has the right to appoint such committees or commissions, to be composed, in part or wholly, of its own members, to make investigation and report upon any matter related to the discharge of their legislative duties. But the discharge and performance of the details of Act No. 4 is not a legislative matter. It was the sole province of the General Assembly to enact the law. It is the duty of the Judicial department to construe it, and it will be the duty of the executive department to enforce it; and we think it is beyond the power of the General Assembly to confer executive powers upon its members, and we think the appointment of members of the General Assembly to membership on the Refunding Board is in contravention of the spirit, if not the letter, of the sections of the Constitution above referred to. The General Assembly has the power to name the persons, whether officials or not, who shall execute the laws it may pass. For instance, it was held in the case of *Cox* v. *State,* 72 Ark. 94, 78 S. W. 756, 105 Am. St. Rep. 17, that the act providing that the members of the Board of State Capitol Commissioners should be elected by the two Houses of the Legislature is constitutional. But it is a different matter to say that the Legislature might create a capitol or other commission, and thereafter elect its members to the places created."

The language of § 2 of Act No. 83, here involved, is so similar to that of § 1 of Act 4 of 1941, as regards the members of the General Assembly, that no sound distinction can be made between the decided case and the case at bar. The Governor, the Attorney General, and the Lieutenant Governor are eligible to serve as *ex-officio* members of the Commission because Art. 6 § 1 of the Constitution, as amended by Amendment No. 6, provides that these officials are executive officers; and

the inhibition mentioned in Art. 5 § 10 of the Constitution applies to legislative officers. So the effect of our holding on this point is that there must be removed from the Commission two Senators and three Representatives appointed under §§ 2(c) and 2(d) of Act No. 83, and the Speaker of the House, as appointed under § 2(a) of the Act. Thus, the Commission is left composed of the Governor, the Attorney General, and the Lieutenant Governor, as *ex-officio* officers, and the three citizens appointed by the Governor under § 2(b) of the Act.

II. *The Attack On Section* 11 *Of Act No.* 83. This section reads in part as follows:

"SECTION 11. The members of the Commission and the duly authorized employees and representatives of the Commission when so directed by the Commission shall have the power and authority to examine, during the usual business hours of the day, all records, books, documents and other papers touching upon or concerning the matters and things about which the Commission is authorized to conduct an investigation, and the Commission shall have the power and authority to require all persons, firms, and corporations having such books, records, documents, and other papers in their possession or under their control, to produce the same within this State at such time and place as the Commission may designate, and to permit an inspection and examination thereof by members of said Commission or its authorized representatives and employees."

The quoted language brings us face to face with Art. 2 § 15 of the Arkansas Constitution, which reads in part: "The right of the people of this State to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; . . ." We cannot put the stamp of approval on Section 11 of the Act No. 83, which would allow the Commission, or its members or representatives, without search warrants or judicial process, to conduct an examination of the records, books, documents, and other papers, of anyone, just as might be desired. The quoted language of § 11 literally allows the Com-

mission, or its representatives, to go at will and examine all of the books, records, and papers of any person without notice, search warrant, or judicial process. While we are anxious to preserve the State's sovereignty, we must be just as anxious to preserve the constitutional safeguards of the citizens. The power here granted under § 11 is not like the visitorial powers the State has over corporations (see *Hammond Packing Co.* v. *State,* 81 Ark. 519, 100 S. W. 407, 100 S. W. 1199); nor is the power like that which may be exercised by the State in its regulatory power over public utilities. Rather, here, we are dealing with the rights of citizens; and the constitutional guarantees are superior to the legislative enactments.

The Sovereignty Commission has ample power under § 12 of the Act No. 83 to initiate investigations and summon witnesses. It can apply to the Court for *subpoena duces tecum*; and, under § 13 of the Act, the Commission may apply to a court to enforce its desired process. As we understand §§ 12 and 13, the proper court may issue process and hear contempt matters on request of the Sovereignty Commission. As so understood, full judicial protection is accorded; and such is the orderly and constitutional manner of procedure. So we strike § 11 of the Act No. 83 as being unconstitutional.

III. *The Claim Of Racial Discrimination.* The plaintiffs showed that they were Negro ministers, and claimed that the Act No. 83 interfered with their rights as such citizens. We find nothing in the Act to support such claim. Section 10(d) of the Act No. 83 refers to school integration, and Section 18 also refers to the integration decision.

That the decision in *Brown* v. *Board of Education,* 347 U. S. 483, 98 L. Ed. 873, 74 S. Ct. 686, 38 A.L.R. 2d 1180, and the cases following it, have created a serious condition in the South was recognized by the United States Supreme Court when it was stated that the lower Federal Courts would proceed as the facts in each situation justify. See *Brown* v. *Board of Education,* 349 U. S. 294, 99 L. Ed. 1083, 75 S. Ct. 753. So the very

nature of the decree in *Brown* v. *Board of Education* constitutes judicial recognition by the Supreme Court of the United States that some time will be required— how long none of us can tell—before the opinion of the Supreme Court of the United States in regard to integration in the southern schools can ever be carried into effect. The Legislature of Arkansas, both in § 10(d) and in § 18 of the Act No. 83, has also recognized the same serious situation. But the Act No. 83 is not a racial discrimination act: rather, it is an act to preserve the State's sovereignty against the gradual encroachments of the Federal Government. As early as 1943 the Legislature of Arkansas perceived that the Federal Government was gradually encroaching on the sovereignty of the States; and the Act No. 166 of 1943 was captioned: "An Act to Provide for the Participation by this State in Organized, Concerted Action of the Several States to Secure the Return to Them After the War of all Normal State Powers Which During the War May Be Exercised by the Federal Government, and to Prevent Further Future Encroachments by Federal Bureaus, Boards, and Commissions, Into the Field of Usual State Functions, by Imposing upon the Attorney General Certain Duties with Respect to Existing and Proposed Federal Legislation." The present Act No. 83 is a further step by the State of Arkansas to protect its sovereignty against the encroachments of the Federal Government. The administration of Act No. 83 may lead to matters that will require further court action; but we cannot, in this declaratory judgment proceeding, say that the entire Act is unconstitutional on its face. *Shuttlesworth* v. *Birmingham Board of Education,* 162 F. Sup. 372; affirmed by U. S. Supreme Court, 358 U. S. 101, 3 L. Ed. 2d 145, 79 S. Ct. 221.

IV. *Conclusion As To The Act No.* 83. We have carefully studied all of appellants' attacks on the Act No. 83, and find none to possess merit except those already discussed. The Act has a separability clause; also it is remedial and is neither penal nor criminal: therefore, it is to be liberally construed to effectuate its purposes. For these and other reasons arising because of

the rules of statutory construction, it is our duty to strike the invalid portions of the Act No. 83, and allow the other portions to stand. *Cotham* v. *Coffman*, 111 Ark. 108, 163 S. W. 1183. Therefore, we strike § 11 from the Act; also we hold that members of the General Assembly cannot be members of the Commission. To those extents we modify the decree of the Chancery Court; and, as so modified, the decree is affirmed as regards the Act No. 83.

## ACT NO. 85.

When we come to Act No. 85, we have a vastly different situation. That Act is captioned: "An Act to Require Persons Engaged in Certain Activities to Register With and Make Periodic Reports to the State Sovereignty Commission; and for Other Purposes." The Act requires that all persons who collect any money for any of the purposes set forth in § 5 of the Act, register with the Commission and furnish the name and address of every person who makes a contribution. Failure of compliance would result in fine or imprisonment. Section 5 of the Act reads in part:

"SECTION 5. The provisions of this Act shall apply only to such persons who, by himself or through any agent or employee or other person in any manner whatsoever, directly or indirectly, solicits, collects, or receives contributions to be used in whole or in part to aid in the accomplishment of any of the following purposes:

"(a) The passage by the Congress of the United States of any proposed or pending legislation which is designed to limit or circumscribe in any manner the operation and control of school districts in Arkansas by the duly elected and qualified officers, directors, agents and employees of such school districts."

Thus the Arkansas Legislature has undertaken to require the registration with the State Sovereignty Commission of all persons who collect money to be used, in whole or in part, to influence the passage of certain legislation by the Congress of the United States. Can a

State validly enact such a law to affect the national Congress? That is the question.

The Congress of the United States, by its Act of August 2, 1946, enacted a law commonly referred to as "Regulation of Lobbying." See U.S.C.A. Title 2, § 261 *et seq.* This Federal Act provides for certain information to be furnished to the Clerk of the House of Representatives of the United States concerning the sources of all contributions. The Federal Act says in part (Title 2, § 266 U.S.C.A.):

"The provisions of this chapter shall apply to any person . . . who . . . solicits, collects, or receives money . . . to aid in the accomplishment of any of the following purposes:

"(a) The passage or defeat of any legislation by the Congress of the United States.

"(b) To influence, directly or indirectly, the passage or defeat of any legislation by the Congress of the United States."

This Act of the Congress was upheld in *U. S.* v. *Harriss*,[2] 347 U. S. 612, 98 L. Ed. 989, 74 S. Ct. 808, so the Congress of the United States has acted in a field in which it has the power to act. It is clear that § 5(a) of the Arkansas Act No. 85 was designed to require some of the same information to be furnished the State Sovereignty Commission of Arkansas that the Act of

___

[2] The Supreme Court of the United States said in that case:

"Toward that end, Congress has not sought to prohibit these pressures. It has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose. It wants only to know who is being hired, who is putting up the money, and how much. It acted in the same spirit and for a similar purpose in passing the Federal Corrupt Practices Act —to maintain the integrity of a basic governmental process. See *Burroughs & Cannon* v. *U. S.*, 290 U. S. 534, 545, 78 L. ed. 484, 489, 54 S. Ct. 287.

"Under these circumstances, we believe that Congress, at least within the bounds of the Act as we have construed it, is not constitutionally forbidden to require the disclosure of lobbying activities. To do so would be to deny Congress in large measure the power of self-protection. And here Congress has used that power in a manner restricted to its appropriate end. We conclude that §§ 305 and 308, as applied to persons defined in § 307, do not offend the First Amendment."

the Congress of the United States requires to be furnished to the House of Representatives. In the division of State and Federal powers there are some fields of legislation concurrent to both governments; and in other fields of legislative action by the Federal Government within its powers necessarily precludes action by the State Government on the same matter. The holdings on this point are summarized most clearly in 11 Am. Jur. 871, "Constitutional Law" § 175:

"The principle is therefore fundamental that state laws must yield to acts of Congress within the sphere of its delegated power. It is very obvious that where Congress has under the Federal Constitution the right of exercising exclusive jurisdiction and puts forth its power to cover the field, state legislation ceases to have efficacy; for when Congress passes a law in that field of legislation common to both Federal and State governments, the act of Congress supersedes all inconsistent State legislation. Congress in regulating a matter within the concurrent field of legislation speaks for all of the people and all of the States, and it is immaterial that the public policy embodied in the congressional legislation overrules the policies theretofore adopted by any of the States with respect to the subject matter of such legislation."

Furthermore, in 11 Am. Jur. 307, "Conflict of Laws" § 8, the holdings are summarized:

"The States, however, cannot invade a field which belongs exclusively to Congress. Likewise, where Congress has legislated upon a subject which is within its constitutional control and over which it has the right to assume exclusive jurisdiction and has manifested its intention to deal therewith in full, the authority of the States is necessarily excluded, and any State legislation on the subject is void. Moreover, the State has no right to interfere or, by way of complement to the legislation of Congress, to prescribe additional regulations and what they deem auxiliary provisions for the same purpose."

The rules announced in the foregoing quotations are too well recognized to require further discussion. It is clear that the State of Arkansas has no power to enact § 5(a) of the Act No. 85 in the face of the said Federal statute. U.S.C.A. Title 2, § 261 *et seq.* So § 5(a) of the Act No. 85 must be declared void, as we now do.

The next question is the effect of such holding on the entire Act No. 85. In considering Act No. 83, we could strike certain portions and still leave the remainder to be valid. But as regards Act No. 85 the situation is entirely different. The Act No. 85 contains no separability clause, as did Act No. 83. Furthermore the Act No. 85 imposes penalties,[3] and is therefore to be strictly construed for the protection of the citizen. *Hughes* v. *State,* 6 Ark. 131; *State* v. *International Harvester Co.,* 79 Ark. 517, 96 S. W. 119; *Fiser* v. *Clayton,* 221 Ark. 528, 254 S. W. 2d 315; *Thompson* v. *Chadwick,* 221 Ark. 720, 255 S. W. 2d 687. The purpose of the Act was to require the registration of those who would attempt to influence legislation. We cannot say that the Act No. 85 would have been enacted without § 5(a) being a part thereof. We therefore hold that since § 5(a) is void, the entire Act No. 85 must fall.

It therefore follows that so much of the decree of the Chancery Court as held the Act No. 85 to be valid should be and the same is hereby reversed and Act No. 85 is held to be void.

---

[3] Section 8 of Act 85 reads: "Any person who violates any of the provisions of this act shall, upon conviction, be guilty of a misdemeanor and shall be punished by a fine of not more than $5,000.00 or imprisonment for not more than twelve (12) months, or by both such fine and imprisonment."